## ROBERTSON vs. KETCHUM.

An exchange of horses was made between the plaintiff's agent and the defendant, upon terms which, as the defendant knew, the plaintiff had himself refused to adopt, as the basis of an exchange. The plaintiff did not know of the bargain until after it was made; nor did he know the terms of it, and that it was contrary to his proposition, until after the death of the horse received in exchange had put it out of his power to return it. And he repudiated the bargain as soon as he knew what it was. *Held* that an action might be maintained by the plaintiff to recover the value of the horse delivered by his agent, to the defendant.

A transfer of property by an agent who exceeds his authority in a material point, passes no title to the thing delivered; which may therefore be reclaimed by the owner.

In the contract of sale or exchange by an agent, as in all other acts done by him, it is essentially requisite, in order to bind the principal, that the authority should be pursued; otherwise the contract is void. This must especially be the case when the purchaser knows that the agent is violating his instructions, and they agree to conceal from the principal the fact of such violation.

THIS cause was originally commenced in a justice's court, where the plaintiff complained that on or about the 26th of November, 1849, he was the owner of, and had in his possession, a certain bay or sorrel mare, of the value of $30, which afterwards came into the defendant's possession without the consent of the plaintiff, and that the defendant refused to deliver the said horse to the plaintiff; wherefore he demanded judgment for $30. The defendant, by his answer, denied the allegations in the complaint; and alledged that on the 26th of November, 1849, the plaintiff and defendant traded and exchanged horses, upon the following terms: the defendant let the plaintiff have a certain black horse, and the plaintiff let the defendant have a certain bay mare, and agreed to deliver to him a double harness; and that the defendant in no other manner, and on no other conditions, ever received any horse or mare of the plaintiff. On the trial, William J. Robertson, a witness for the plaintiff, testified that he was a son of the plaintiff; that the plaintiff owned a bay mare; that about the 26th of November, 1849, the witness let the defendant have said mare; that his father did not authorize him to part with the mare. On his cross-examination

Robertson *v.* Ketchum.

he testified that he lived with the plaintiff and was in his employ, in the harness business ; that he was between nineteen and twenty years old ; that he was in the habit of making sale of some few articles out of the shop, when no other person was present ; that the plaintiff did not approve of his bargains, as a general rule, but never repudiated any, except this one.   He further testified as follows : "The defendant exchanged a horse for the mare ; the bargain for the exchange was made in the shop, we talked about it at Mr. Durand's, the first conversation was in the shop, the plaintiff, defendant, Mr. Kingsbury and myself were present at the conversation, it was in relation to the trade ; the plaintiff, defendant and witness came into the road and had a conversation about the horse and looked at him, I rode the horse in presence of the plaintiff: we all three went then into Mr. Durand's house : we talked about the trade in Mr. Durand's, defendant made a proposal to plaintiff for a trade, defendant proposed to let plaintiff have his horse for plaintiff's mare, a double harness and $5 ; plaintiff said he would not give the harness to boot ; I saw the plaintiff and defendant would not make a bargain, I asked the defendant to go to the shop and look the harness over, I did not go into Durand's again that night, plaintiff did not come out of Durand's, defendant and I went up to the barn and exchanged horses.   I put the defendant's horse into plaintiff's stable and kept him over night, I do not know that the plaintiff saw the horse in the morning, but he did see him during the day.   When I and the defendant made the trade in the shop, I told him I would give him between the horses, the harness, repair and oil it and put a new set of blinds, and a new set of round lines ; a new set of pole straps he took with him.   Defendant was to keep the new work he received a secret.   On the strength of this bargain we exchanged horses, plaintiff said he would not trade in the night.  The harness I let the defendant have was the harness we talked about in Durand's, a second hand harness.   Durand, the plaintiff, defendant, Hiram Hoose and a stranger were present at Durand's when we had the conversation about the trade, the plaintiff said he was not willing to give the harness to boot, he also

said he would not trade in the night, and that he would not make any new work for the harness. Plaintiff knew when the defendant and I went out. I, in the presence of the plaintiff, asked the defendant to go and look at the harness again, the plaintiff, defendant and I sat in the room around the stove when I asked the defendant to go to the shop and see the harness. But I do not know that the plaintiff knew where we were going." He further testified that the mare, in his opinion, was worth ten or twelve dollars; that the plaintiff was not a horse dealer, and it was not in the line of his business to trade harnesses for horses; that when the plaintiff was present the witness asked him about trades; that the witness never traded a harness for a horse, before this trade, and the plaintiff did not sanction this trade. That the witness asked the defendant to keep this trade a secret, and told the defendant he, the witness, would not let the plaintiff know any thing about it; that the plaintiff never told him, the witness, to trade the mare away; and the next morning after the trade he did not consent to it; that the work the witness was to do, unbeknown to the plaintiff, was worth $6 or $7. Another witness testified that on the Thursday next after the exchange the plaintiff and defendant were in the plaintiff's shop together; the defendant said he was sorry the plaintiff had lost his horse; the plaintiff said it was not his horse, and if he, the defendant, did not bring home the plaintiff's horse he would prosecute the defendant; the defendant said he had traded with W. J. Robertson, and that the plaintiff had acknowledged it. The plaintiff said there was no such thing. Defendant refused to bring the horse back. A witness for the defendant testified that he was present at the conversation between the parties, at Durand's; that "Wm. J. Robertson went out and the defendant followed him; the defendant came back and said they had traded; while we were talking the plaintiff came in again and said, have you traded? Defendant said, yes; defendant said if you are not suited with the trade we will trade back; plaintiff said, how did you trade? Defendant said, pretty near as you and I talked—a little different—and if you are not suited with the trade, we will trade back. Durand spoke and

said to-night you mean ; the defendant said yes, to-night, the defendant said if you are suited with the trade we will take something to drink and let that be the end of it." That the parties drank together, and soon afterwards separated. The jury found a verdict for the defendant, and the justice rendered a judgment for $3,24, for costs. The county court of Washington county affirmed the judgment; and the plaintiff appealed to this court.

*James J. Lowrie,* for the appellant.

*C. R. Ingalls,* for the respondent.

*By the Court,* WILLARD, P. J.   It was competent for Wm. J. Robertson, the son of the plaintiff, to act as agent for his father, notwithstanding his minority.   A sale or exchange made by him of the horse in question, though without express authority from the plaintiff, would pass the title, if the latter with full knowledge of the terms of the sale, ratified and confirmed it.   Subsequent assent, under such circumstances, is equivalent to a precedent authority.   ·(*Dunlap's Paley on Agency*, 171, *note o, where all the cases are collected.*)

There can be no doubt, from the evidence, that the exchange of horses made by the agent was upon terms which the plaintiff had refused to adopt as the basis of an exchange ; and this was well known to the defendant when he completed the exchange. The plaintiff did not know of the bargain until after it was made, nor did he know the terms of it and that it was contrary to his proposition, until after the death of the horse had put it out of his power to return it.   He repudiated the bargain as soon as he knew what it was.

A transfer of property by an agent who exceeds his authority in a material point passes no title to the thing delivered, which may therefore be reclaimed by the owner.   (*Dunlap's Paley on Agency*, 341.)   In the contract of sale or exchange by an agent, as in all other acts done by him, it is essentially requisite, in order to bind the principal, that the authority either express or

implied should be pursued. (*Id.* 212.) If the authority be not pursued, the contract is void. This must especially be the case, when the purchaser knows that the agent is violating his instructions, and they agree to conceal from the principal the fact of such violation.

There was no conflict in the evidence, on the fact that the actual exchange of horses, made by the agent, was upon a consideration which the plaintiff had never authorized, and that this was known to the defendant at the time. A verdict finding to the contrary is not merely a verdict against the weight of evidence, but is a verdict without a particle of evidence to support it.

The ground on which the county judge affirmed the judgment of the justice was that there was evidence of a subsequent ratification of the bargain by the plaintiff. The evidence was that the plaintiff asked the defendant how he traded, to which the latter replied, "*pretty much as you and I talked,* a little different, and if you are not suited with the trade we will trade back this evening." Upon this the parties drank together and parted. This answer of the defendant was untrue. The trade was made, not as the plaintiff had proposed, but as the defendant had offered, and which offer the plaintiff had expressly rejected. If the defendant had truly disclosed the terms of the bargain, when he was asked, and the plaintiff had silently acquiesced, it would have presented quite a different question. No doctrine is better settled, on principle and authority, than this, that the ratification of the act of an agent previously unauthorized, must, in order to bind the principal, be with a full knowledge of all the material facts. If the material facts be either suppressed or unknown, the ratification is invalid, because founded on mistake or fraud. (*Paley on Agency by Dun.* 172, *n. Owing* v *Hull,* 9 *Peters,* 608.) The answer of the defendant to the plaintiff's inquiry was untrue, and was well calculated, and doubtless intended, to prevent further inquiry. The defendant had agreed with the agent to conceal from the plaintiff the departure from his instructions. It would be a reproach to the law to uphold such a fraud. There was no dispute about facts. The jury drew an erroneous conclusion from the testimony. They must have held that sub-

sequent assent to the trade was a ratification of the bargain, whether the plaintiff knew of its terms or not.

The judgment of the county court and of the justice must be reversed.

[St. Lawrence General Term, September 1, 1851. *Willard, Hand* and *Cady*, Justices.]